IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 11-cv-02599-PAB-MJW

H&R BLOCK TAX SERVICES LLC,

    Plaintiff,

v.

LINDA WILD,

    Defendant.

---

**ORDER**

---

    This matter comes before the Court on the Application of H&R Block Tax Services LLC ("Block") to Confirm Arbitration Award [Docket No. 1] filed pursuant to Sections 9 and 13 of the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.*, and the Amended Stipulation to Confirmation of Final Arbitration Award [Docket No. 5] for (a) confirmation of the Final Arbitration Award, together with the Interim Arbitration Award (the "Award") entered in the arbitration proceeding captioned *Linda Wild v. H&R Block Tax Services LLC f/k/a H&R Block, Inc.*, AAA Case No. 77 11426610 LBG, and (2) judgment upon the Award. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Upon consideration of the entire record, and the Court deeming it just and proper to do so, it is hereby ORDERED that:

    1.    The Application of H&R Block Tax Services LLC to Confirm Arbitration Award [Docket No. 1] is GRANTED;

    2.    The Award (attached hereto as Exhibit A) is confirmed; and

3. Judgment is entered in favor of H&R Block Tax Services LLC and against Linda Wild upon the Award.

DATED October 26, 2011.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge

From:JANS  303-534-1254           To:15594901919           09/26/2011, 18:18      #633 P.002/002

### AAA Case No: 77 11426610
### Linda Wild v. H&R Block Tax Services

#### Final Arbitration Award

We, Edward Wood Dunham, Carmen D. Caruso and John P. Leopold, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and dated June 8, 1981, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and upon the agreement and joint motion of the parties do hereby issue this FINAL ARBITRATION AWARD, as follows:

1. The Interim Arbitration Award issued by the Arbitration Panel, dated June 15, 2011, is hereby converted to a Final Arbitration Award with respect to all substantive issues decided in that Award;

2. The counterclaims submitted by Respondent H&R Block Tax Services LLC in this matter are hereby dismissed without prejudice;

3. Each party shall bear its own attorneys' fees, arbitrator fees and other expenses; and

4. Each party shall pay half of any remaining Third Arbitrator fees and arbitration administration fees.

This Award resolves all claims and counterclaims submitted in this matter.

Dated:

BY THE PANEL

_____   _____   _____   9/26/11
Edward Wood Dunham         Carmen D. Caruso           John P. Leopold

RECEIVED TIME SEP. 26.  3:51PM

EXHIBIT A

<u>AAA Case No. 77 114 266 10</u>
<u>Linda Wild v. H&R Block Tax Services</u>

<u>Interim Arbitration Award</u>

We, Edward Wood Dunham, Carmen D. Caruso and John P. Leopold, having been designated in accordance with the arbitration agreement entered into between the above-named parties, and dated June 8, 1981 (Franchise Agreement, Exhibit 11), and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby issue this INTERIM AWARD, as follows:

The hearing in this arbitration took place at the Denver, Colorado AAA offices on May 23 – 25, 2011. Although each party designated a panelist, all three Panel members have been and continue to be neutral. "This Code establishes a presumption of neutrality for all arbitrators, including party-appointed arbitrators, which applies unless the parties' agreement, the arbitration rules or applicable laws provide otherwise." *American Arbitration Association Code of Ethics for Arbitrators in Commercial Disputes*: Preamble, 2004 (page 4).

At the hearing, Claimant ("Claimant" or "Mrs. Wild") was present, represented by Matthew J. Kreutzer, Esq. (Armstrong Teasdale LLP) and Thomas Neville, Esq. (Ogborn, Summerlin & Ogborn, P.C.). Respondent ("Respondent" or "Block") was represented by Peter J. Klarfeld, Esq. and Jimmy Chatsuthiphan, Esq. (Gray, Plant, Mooty, Mooty & Bennett, P.A.). The Panel appreciates the professional and helpful presentation by all counsel. As we stated at the outset of the hearing, pursuant to the Franchise Agreement and after considering Judge Blackburn's decision, we find that we have the authority to decide the issues herein.

## I. Underlying Facts

The case's factual basis is largely undisputed. Claimant has been a tax preparer for 40 years. During most of that time, she has been an H&R Block franchisee. In the early years, before the advent of computerized filing and the Internet, Claimant filed paper tax returns for her clients.

More recently, virtually all tax preparers have come to utilize on-line filing for the great majority of returns. For several years, Block has expected its franchisees to use its tax preparation software ("TPS") and its financial information network software ("FIN"). Testimony revealed that Mrs. Wild is one of only two Block franchisees who have refused to accept these requirements. (The other hold-out is also represented by at least one of Mrs. Wild's lawyers.)

Block and Mrs. Wild entered into a franchise agreement in 1978. This agreement was renewed every five years, essentially without dispute or incident, until sometime before 2006. The franchise agreement contains a clause whereby the agreement "shall automatically renew itself for successive five-year terms thereafter [] provided, that Franchisee may terminate this Agreement effective at the end of the initial term or any renewal term upon at least 120 days written notice to Block prior to the end of the initial term or renewal term, as the case may be." (Exhibit 11, ¶3).

In 2006, the parties disputed whether Mrs. Wild was required to use the TPS software. Mrs. Wild had for a long time been using a Drake Software product. During the hearing, Block did not dispute the overall efficacy of the Drake product. However, Block believes that uniformity in all of its offices (nationwide) is essential to its mission and its services.

On the other hand, Mrs. Wild testified that Drake was quicker and more efficient than TPS. She also expressed concern that Block's proposed Franchise Electronic Filing and Software Agreement (Exhibit 13) would give Block unlimited access to her computer (which includes personal information as well as the work that she does as a tax preparer). She objected to what she characterized as the requirement that franchisees would have to pay a 33 cent per page[1] transmission fee (as opposed to a flat $2 per return fee with Drake); and complained that she could not run her payroll within the TPS system; that all of her clients would have to sign a Block client services agreement; and that she would have to "surrender some of her freedom" to maintain her relationship with Block.

One of Mrs. Wild's greatest purported concerns is that TPS would require her clients to give up an appreciable amount of their privacy rights. Mrs. Wild submitted a substantial number of Declarations (Exhibit 85) from her clients. Those clients express concerns that, "(Mrs. Wild's

---

[1] In fact, Exhibit 13, Block's Franchise Electronic Filing and Software Agreement, refers to a "transaction fee ... of $0.33 per return for all federal returns successfully transmitted and $0.33 per return for all state tax returns successfully transmitted for customers of Franchisee."

5

business) has assured me that no one outside the Business[2] organization, other than the electronic filing company used by the Business, will have access to or be able to view the information on my tax return. . . . (I) f the Business were to use the H&R Block Software, the Business would be required to first obtain my consent through a 'Client Service Agreement.' I understand that the purpose of this consent is to permit the Business to share my personal (or business) income tax information with H&R Block[3] (as broadly defined in the Client Service Agreement) through the H&R Block software."

Given the circumstances under which Mrs. Wild obtained these declarations, however, (i.e., she solicited the declarations through result-oriented letters that contained information that Block contends was misleading) the Panel does not find them to be credible evidence with respect to the merits of using TPS software. Whether these clients of Mrs. Wild will actually take their business elsewhere remains to be seen, but if they do, that unfortunate development will be an injury that she inflicted on herself, and potentially on Block.

Respondent acknowledged that the early years of its relationship with Mrs. Wild were beneficial for both sides. However, as the aforementioned computerized tax returns became a way of business, Block sought to bring all of its franchisees under a single, unified program (TPS and FIN). Accordingly, on February 13, 2003, Block wrote to Mrs. Wild, stating that her failure to offer its Easy Pay system (within WinTPS) "is in breach of your franchise agreement." (Exhibit 55).

Claimant's former attorney, Jeffrey Goldstein, responded on her behalf and disputed the allegation of breach. (Exhibit 56) Apparently, the issue was deferred.

On December 9, 2003, Block wrote to Mrs. Wild about its requirement that she utilize FIN, (Exhibit 58). Mrs. Wild acknowledged that she would have to utilize TPS to satisfy FIN's requirements.

In 2006, when Mrs. Wild's franchise was most recently renewed, the TPS question was again at issue. Initially, Mrs. Wild indicated that she would rather not renew her franchise, if renewal meant that she would have to use TPS. She gave Block written notice of her intent not to renew. However, Block permitted her to withdraw that notice, provided that she did so by May 15, 2006. (Exhibit 61). On June 6, 2006, Mrs. Wild sent such a letter. (Exhibit 64).

---

[2] The "Business" is Advantage Tax Solutions, the H&R franchise owned by Mrs. Wild.
[3] Mrs. Wild and the Declarants stated that this would include "H&R Block Services, Inc., its parents, subsidiaries, affiliates, and the franchisees and any of them." Exhibit 85, 2.

On June 16, 2006, Block wrote to Mrs. Wild and granted her an additional concession for the relevant renewal period. Block offered Mrs. Wild three options, including the renewal of her existing franchise agreement. (Exhibit 65) Mrs. Wild accepted that option and renewed her 1991 franchise for an additional five year term that would expire on June 11, 2011. The discussions between Mrs. Wild and John Greenway, a Block vice-president, did not indicate that the 2006 renewal would be a "final term."

The parties continued their relationship, as it had been before 2006, throughout much of the 2006 term. By early 2009, the parties again discussed TPS and Mrs. Wild's refusal to utilize it. Mrs. Wild and Darcy Daniels had discussions about this throughout the first half of 2009. By June, 2009, Ms. Daniels specifically requested that Mrs. Wild convert her office system from Drake to TPS. (Exhibit 68). Mrs. Wild declined to do so.

Cheryl Bisbee, vice president and assistant general counsel for Block, testified that TPS became mandatory in 2009.[4] Block contends that TPS allows for improved compliance with Internal Revenue Service regulations and better delivery of Block's services. TPS also permits Block clients to access their records in almost every H&R Block office throughout the United States. Programs such as Second Look, Peace of Mind and the Emerald Card are available to all of Block's customers, but only in offices that use TPS.[5] Mrs. Wild did not contest the evidence that, by her choice, her "H&R Block" office does not provide the full range of services that Block offers to its customers system-wide.

On March 24, 2010, Block wrote to Mrs. Wild stating that her continued failure to use TPS and FIN were "significant violations of [Block's] franchise policies and procedures. We further consider these violations to be material breaches of your franchise agreement." Block gave Mrs. Wild through and including May 1, 2010 within which to install its software and to convert "all existing client data from all previous tax preparation software systems utilized in your office(s) to TPS." (Exhibit 12) Mrs. Wild did not comply with Block's demand, and to this day uses neither TPS nor FIN in operating her Block franchise.

---

[4] Arguably, the actual effective date was in 2010 (Exhibit 12).
[5] Ms. Bisbee testified that 97-98% of Block franchises utilize TPS. In fact, that number is actually 99%+.

4

## II.   Analysis

At the hearing, Claimant withdrew her fifth and sixth claims. Therefore, the Panel considers Mrs. Wild's two declaratory judgment claims; her two claims that sound in breach of contract (including breach of the implied covenant of good faith and fair dealing) and her claim that Block waived its right, if any, to require her to use the TPS and FIN programs.

The parties' agreements are governed by Missouri law. That law grants courts (and, by implication, arbitration panels) wide discretion in affording relief from uncertainty and insecurity. However, if an adequate remedy exists, the Missouri Declaratory Judgment Act may not be invoked. *King Louie Bowling Corporation of Missouri v. Missouri Insurance Guaranty Association*, 735 S.W. 2d 35 (Mo. App. W.D. 1987); *City of St. Louis v. City of O'Fallon*, 324 S.W. 3d 756 (Mo. 2010). Claimant's issues can be resolved under her breach of contract/breach of the covenant of good faith and fair dealing claims. Therefore, the Panel denies her declaratory relief.

Mrs. Wild raised the question whether Block, in its attempt to enforce the notice of default sent to her in March 2010 (exhibit 12), violated the disclosure requirements imposed on all franchisors in the United States by the Federal Trade Commission Franchise Rule (16 CFR 436.1) (the "FTC Rule"). Mrs. Wild contended that since she never signed a franchise agreement that required her to migrate to the TPS software, any attempt by Block to require her to do so is an inherent violation of the FTC Rule, as Block never disclosed to her in a Uniform Franchise Offering Circular that she could be required under her 1981 franchise agreement (or in any renewal from 1986 through 2006) to use TPS.

Initially, the Panel felt that Mrs. Wild's argument might have introduced an interesting twist to these proceedings. It appeared that she was arguing (or that she might have been able to argue) that, in failing to disclose to her (when she last renewed in 2006) that she might be required under her 1981 franchise agreement to migrate to TPS during the next renewal period, there allegedly was a disclosure violation by Block in the 2006 renewal process. For example, the panel questioned whether Block, in the 2006 renewal process, had been required to disclose to Mrs. Wild that she might be required to sign additional contracts with Block (such as Exhibit 13) in order to remain in compliance with her 1981 franchise agreement.

The Panel noted (and expressed during oral argument) that this type of disclosure argument might have served to "buy time" for Mrs. Wild, in which she would presumably have had the opportunity to reconsider her position (by accepting TPS) and thus avoiding the possible loss of her franchise. In other words, if the only problem was an alleged failure by Block to disclose its claimed right to require its franchisee to use TPS, in the precise manner demanded by the FTC Rule, then presumably Block would be able to correct that possible error and – sooner or later – Mrs. Wild would be facing the same result (the loss of her franchise) – if she failed to comply with her contract.

In closing arguments, the Panel specifically questioned Mrs. Wild's counsel about whether she was pursuing the "disclosure violation argument" outlined above. In response, counsel made clear that from Mrs. Wild's vantage point, her franchise relationship with Block was irreparably broken, and that she was not interested in pursuing an argument that would merely "buy time" before she was required to migrate to TPS.

In view of Mrs. Wild's expressly stated position in the closing arguments, the Panel finds that she has knowingly and intentionally waived any objections to the notice of default that was served on her in March 2010 (Exhibit 12) based on alleged violations of the FTC Rule in connection with the franchise renewal process in 2006 (or in 1981 or in any of the previous renewals from 1986 onward). She expressly and specifically waived any argument that would have been calculated to "buy time" to reconsider her position on the TPS and to possibly avoid the loss of her franchise.[6] The Panel accepts Mrs. Wild's waiver of this potential argument, and therefore the Panel makes no findings as to whether Mrs. Wild had been entitled to greater disclosure by Block (at any time before Block issued the March 2010 notice of default).

The balance of this Award addresses Mrs. Wild's remaining claims. The Panel unanimously makes the following findings and enters its award.

---

[6] We say "possibly" because even if Mrs. Wild were to dodge the bullet with respect to the March 2010 notice of default, which she admittedly and deliberately did not cure, she would still face the notice of default that Block sent in April 2011 following Mrs. Wild's issuance of a press release (exhibit 90) that Block contends was defamatory to Block, and thus injurious not only to Block, but to every other franchisee in the Block system. At this time, whether Mrs. Wild committed an actionable defamation or other wrong in connection with her press release is not before the Panel. The related question – whether Block may enforce its notice of default dated March 24, 2011, Exhibit 12 – is moot in view of the remainder of this Award.

### A. *Wild's Claims for Breach of Contract, including Breach of the Covenant of Good Faith and Fair Dealing*

Consistent with all other states, Missouri holds that every contract contains an implied covenant of good faith and fair dealing. "This covenant imposes a duty on each party to cooperate with the other to enable performance and achievement of the expected benefits of a contract. *Newco Atlas, Inc. v. Park Range Const., Inc.*, 272 S.W.3d 886, 893 (Mo. App. W.D.2008). (Internal citation omitted) It is the duty of one party to a contract to cooperate with the other to enable performance and achievement of the expected benefits." *Slone v. Purina Mills, Inc.*, 927 S.W.2d 358, 368 (Mo. App. W.D. 1996).

The Panel concludes that the breach of the covenant of good faith and fair dealing and breach of contract claims are appropriately addressed with an analysis of the covenant of good faith and fair dealing and that Mrs. Wild has failed to carry her burden on both claims.

As Claimant, she must "show that (Block) exercised its discretion in such a manner as to evade the spirit of the transaction or so as to deny (her) the expected benefit of the contract." *Hardee's Food Systems, Inc. v. Hallback*, ___ F. Supp. 2d ___, 2011 WL 830549, 4 (E.D. Mo. 2011). (internal citations omitted). Further, she must "present substantial evidence" that Block "acted in bad faith or engaged in unfair dealing." *Acetylene Gas Co. v. Oliver*, 939 S.W. 2d 404, 410 (Mo. App. E.D.1996).

Additionally, "it is not enough for a plaintiff to show that a party invested with discretion made an erroneous decision. Instead, the plaintiff must show that the party exercised its discretion in such a manner as to evade the spirit of the transaction or so as to deny [the other party] the expected benefit of the contract. The covenant of good faith and fair dealing does not establish a general reasonableness requirement. Unreasonableness can serve only as evidence of subjective intent to undermine fulfillment of the contract." *BJC Health System v. Columbia Casualty Co.*, 478 F.3d 908, 914 (C.A.8 (Mo.) 2007). (internal citations omitted)

We find that, as a franchisor, Block is entitled to expect that its franchisees will comply with its standards of operation, subject to the foregoing requirements of the covenant of good faith and fair dealing. Here, the 1981 franchise agreement expressly obligated Mrs. Wild to comply with Block's operating standards, as Block might amend those standards from time to time.

The issue of Mrs. Wild's non-use of TPS/FIN was discussed in 2006. Notwithstanding these conversations and exchanges of written communications, *supra*, Mrs. Wild continued to insist on using the Drake software. Block tolerated this as it continued to try to persuade Mrs. Wild to convert voluntarily to TPS/FIN. By 2009, however, Block made the business judgment that it could no longer continue to permit any of its franchisees to operate with any system other than TPS/FIN. Block then modified its operating standards, to which Mrs. Wild was required to comply under the express terms of her 1981 franchise agreement (which had been renewed as discussed above).

As noted, Mrs. Wild's conduct prevented Block from providing the full array of services to Mrs. Wild's Block clients, including, but not limited to, national access to their returns on the Block computer system from any Block office (for example, if the client moved to another state and wished to continue to use Block for tax preparation services). With regard to the interpretation of the 1981 franchise agreement, Mrs. Wild is arguing that Block breached its duty of good faith and fair dealing by mandating that its franchisee (through an update to its operations standards) utilize its TPS/FIN programs, and by terminating her franchise because of her persistent refusal to comply with this requirement. However, the Panel finds that Mrs. Wild has failed, by a substantial margin, to prove her allegations of breach of contract based on the implied covenant of good faith and fair dealing, and likewise that she has failed to prove a breach of any express contract terms.

Without question, Block, as the franchisor, not only has a legitimate interest in establishing a uniform procedure for the interviewing of all clients and the preparation of all tax returns that are submitted to the IRS under the Block name, Block arguably has a *duty* to insist on uniformity and the right to insist on monitoring every franchisee's compliance with the uniform procedures that it establishes.

Here, Mrs. Wild is insisting that she has the right to use Drake software. But what if every Block franchisee took the same position, and every franchisee selected his or her own software? That situation, if tolerated by Block, would amount to a fraud on the public, as there would no longer be any such thing as an "H&R Block tax return." Customers entering any H&R Block office have the right to expect a uniform experience, with the assurance that their tax returns are prepared in conformity to the standards that Block has developed and implemented at every single one of its offices. Mrs. Wild's position completely repudiates the franchise

relationship. In effect she wishes to operate an independent, unsupervised tax preparation business under the Block trademark. That position is not tenable. Her adherence to this position conclusively demonstrates that she is correct in concluding that the franchise relationship has been irreparably broken and must end.

Although Mrs. Wild is a decent person, she insisted on running a Block franchise in her way, pursuant to her "view of the rules" and, contrary to her testimony, with little regard to her clients' overall interests as users of Block's services. As the franchisor and owner of the trademarks under which the franchise system operates, Block clearly has the right -- expressly recognized in the subject franchise agreement -- to adapt its policies, practices and franchise operating requirements to changes in the marketplace, with the goal of keeping its franchisees as competitive as possible. Indeed, franchisees would have a legitimate right to complain if Block failed to evolve its system in an effort to keep up with, and (so the franchisees hope) stay ahead of, the competition. The record is devoid of any evidence that would contradict the conclusion that Block's evolving requirements concerning TPS and EIN are an example of such good franchisor practice.

Mrs. Wild has failed to present sufficient proof to support her challenge to TPS. For example, there is no proof that TPS falls below any applicable industry standard with respect to customer privacy, accuracy of tax returns or anything else. There is no proof of any problems with TPS in any of the H&R Block offices that use this software. We are left with Mrs. Wild's speculation that she would experience a loss of customers if she is required to use this software. But speculation is not evidence. Where, as here, a product is already in use at thousands of other offices, and not the slightest proof of even a single problem has been offered, there is no reason to credit such speculation. Block's apparently successful introduction of this software at thousands of offices nationwide -- a fact that Mrs. Wild does not challenge -- clearly overrides her speculation.

In their pre-hearing filings and during the hearing, both parties dedicated substantial time and attention to the question whether Block had the right not to renew the franchise agreement at the end of its current term, pursuant to the Missouri public policy against perpetual contracts. (The *Armstrong* decision) In light of our decision that Block was within its rights to terminate the franchise agreement, we need not resolve the non-renewal dispute. Well before Block notified Mrs. Wild that it had decided not to renew the franchise agreement, Block had sent her a notice

of default and termination for her refusal to use TPS and PIN, and her period to cure this breach passed without her even attempting to cure. Thus, the franchise agreement was already terminated before the events associated with the non-renewal occurred. Accordingly, anything that we would say on this subject would be dicta, or in the nature of an advisory opinion – two pitfalls that the Panel chooses to avoid.

### B. Mrs. Wild's Waiver Claim

Mrs. Wild's seventh claim for relief sounds in waiver. She asserts that Block developed the TPS software at least twenty years ago and has never previously demanded that she use TPS. She further contends that Block now has changed its position, thereby causing her harm and threatening to continue to cause her harm, and asks the Panel to hold that Block waived it right, if any, to impose the TPS requirement on her.

In Missouri, waiver is the intentional relinquishment of a known right. A waiver may be made expressly or may be implied from conduct. However, "for a waiver to be implied from conduct, the conduct must clearly and unequivocally show a purpose to relinquish the right. To rise to the level of a waiver, actions must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of [the] conduct is possible."] *Luck "E" Strike Corp. v. First State Bank of Purdy*, 75 S.W.3d 828, 832-833 (Mo. App. S.D. 2002). (Internal citation omitted) "While a party's conduct can result in waiver of a contractual right, the conduct must be so manifestly consistent with and indicative of an intention to renounce a particular right or benefit that no other reasonable explanation of the conduct is possible." *McNabb v. Barrett*, 257 S.W.3d 166, 170 (Mo. App. W.D.2008).

In a different context, an insurance company's statement that it did not object to a lawsuit was deemed to be a specific waiver of its right to object, exercise its right to participate and thereby be joined in the case. *Kinney v. Schneider National Carriers, Inc.*, 213 S.W.3d 170 (Mo. App. W.D. 2007).

The Panel concludes that Mrs. Wild is not seeking compensatory damages pursuant to her waiver claim; she has asserted it as a means of avoiding her post-termination non-compete obligations under the franchise agreement. Further, an assertion of waiver is one that seeks equitable relief. Accordingly, we make no different findings with respect to Mrs. Wild's waiver claim than with her contract-based claims.

Block demonstrated considerable patience in trying to persuade Mrs. Wild to adopt TPS and FIN, before requiring her to do so. On this record, it would be inequitable to find that Block thereby waived its right to require Mrs. Wild to follow system standards. The Panel also notes that such a finding would serve to encourage franchisors to act in a more peremptory and less flexible fashion in managing system change, an outcome that we believe is unnecessary and counterproductive.

### C. The Post-Termination Covenant Against Competition

Finally, it was clear throughout the proceedings that Mrs. Wild's principal goal in this arbitration was to avoid enforcement of the franchise agreement's post-termination covenant against competition ("non-compete"). (Exhibit 11, ¶11) so that she would be free to continue to operate her business without interruption, notwithstanding the termination of her Block franchise. In Missouri, "Non-compete agreements are typically enforceable so long as they are reasonable. In practical terms, a non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer. Non-compete agreements are enforceable to the extent they can be narrowly tailored geographically and temporally. In addition, such restrictions are not enforceable to protect an employer from mere competition by a former employee, but only to the extent that the restrictions protect the employer's trade secrets or customer contacts." *Healthcare Services of the Ozarks, Inc. v. Copeland*, 198 S.W.3d 604, 610 (Mo. 2006). *See also Brown v. Rollett Brothers Trucking Co., Inc.*, 291 S.W.3d 766 (Mo. App. E.D. 2009).

Mrs. Wild offered no evidence that the franchise agreement non-compete is overbroad either geographically or temporally, and established no other basis on which the Panel could conclude that this provision of her contract with Block should not be enforced.

Mrs. Wild did argue that enforcement of the non-compete in 2011 would prejudice her economically, as she contends that the current real estate market will make it difficult for her to re-let portions of her office space devoted to her Block franchise. Implicitly, she contends that she would have left the Block system in 2006 if she had known that Block was going to mandate her switch to TPS/FIN during the next term of her franchise. However, as noted, Mrs. Wild has expressly waived any contention that that the disclosure provided to her in 2006 was inadequate. She therefore cannot contend that her renewal in 2006 was obtained under false pretenses, and therefore we must conclude that in 2006, Mrs. Wild had notice that Block might thereafter

exercise its discretionary rights under the franchise agreement in the exact manner that Block has done. When she elected to renew in 2006, Mrs. Wild also accepted the risk that market factors might be different at the time of her next renewal. Block, obviously, is not the cause of any downturn in the real estate market, and Block should not be prevented from exercising its contract rights based on market factors that are beyond its control.

Accordingly, we conclude that Mrs. Wild is obligated to comply with the non-compete (but we do not view the non-compete as applying to Mrs. Wild's provision of payroll or accounting services that were not part of the Block franchise).

With respect to Block's counterclaim, the Panel directs that Block perfect the same pursuant to AAA rules (including the payment of the appropriate fee) within 10 days of the distribution of this Interim Award. Mrs. Wild also must fully comply with all AAA rules and requirements.

This Award shall remain in full force and effect until such time as a Final Award is rendered.

Dated: June 15, 2011

BY THE PANEL:

_____
Edward Wood Dunham

_____
Carmen D. Caruso

_____
John P. Leopold

12